Filed 7/19/23  P. v. Yamamoto CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D079669 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS310830 ) |
| EARLE DANIEL YAMAMOTO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Enrique E. Camarena, Judge.  Affirmed in part; reversed in part; remanded with directions.

David W. Beaudreau, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier, Warren Williams, Kathryn Kirschbaum, and Ksenia Gracheva, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Earle Daniel Yamamoto of three counts of forcible rape (Pen. Code,[1] § 261, subd. (a)(2); counts 1, 4, and 10); four counts of forcible oral copulation (§ 287, subd. (c)(2)(A); counts 2, 5, 6, and 8); three counts of sexual penetration by use of force (§ 289, subd. (a); counts 3, 7, and 13); contact with a minor with intent to commit a sexual offense (§ 288.3, subd. (a); count 9); sodomy by use of force (§ 286, subd. (c)(2)(A); count 11); lewd act upon a child 14 or 15 years of age (§ 288, subd. (c)(1); count 14); incest (§ 285; count 15); and two counts of unlawful sexual intercourse with a minor more than three years younger (§ 261.5, subd. (c); counts 28 and 29). The jury found Yamamoto not guilty of one count of forcible oral copulation (§ 287, subd. (c)(2)(A); count 12) and one count of oral copulation of a person under 18 (§ 287, subd. (b)(1); count 26).[2]

The court sentenced Yamamoto to prison for a total of 80 years, consisting of the upper term of eight years for count 1; the middle term of six years for each of counts 2 and 3; the upper term of eight years for count 4; the middle term of six years for each of counts 5, 6, and 7; the upper term of eight years for count 8; the upper term of eight years for count 10; and the middle term of six years for each of counts 11 and 13. The court imposed punishment for all the remaining counts under section 1170; the upper term of four years for count 9; one-third the midterm (eight months) for count 14; and two consecutive middle terms (eight months each) for counts 28 and 29. The court also selected the upper term of three years for count 15, which it stayed per section 654.

---

[1]     Statutory references are to the Penal Code unless otherwise specified.

[2]     The jury also did not reach a verdict on counts 16 through 25, and 27, which constituted lesser included offenses.

2

Yamamoto appeals, contending his trial counsel was constitutionally ineffective because he did not object to the admission of Yamamoto's confession, certain testimonial evidence, and evidence of prior bad acts. In addition, Yamamoto maintains that cumulative errors warrant reversal. Yamamoto also maintains this matter must be remanded for resentencing under recent changes to the law. Finally, he argues that the abstract of judgment must be modified to accurately reflect the assessments imposed at sentencing.

We agree that this matter must be remanded to allow the superior court to resentence Yamamoto under recent changes to the law. In addition, as the parties concede, any amended abstract of judgment must correctly state the amount of assessments imposed. In all other respects, we affirm the judgment.

## FACTUAL BACKGROUND

### Prosecution

### Crimes Involving Yamamoto's Niece

Yamamoto lived with his wife E.Y. and their six children. In 2012, E.Y. and Yamamoto's niece, J.R., moved into the family home so that she could attend the school nearby. She was 16 years old and a sophomore in high school. Yamamoto and E.Y. became her legal guardians, and she stayed with the family for about one year before moving out.

In April 2013, J.R. mentioned during a family dinner that she was planning to clean the bathroom and take a shower. After dinner, she did some chores before going upstairs. In the bathroom, she found a cell phone hidden inside of a toothbrush holder, with the phone camera pointing towards the shower and recording. The cell phone was inside a black sock. J.R. took the phone out of the sock and replayed the video, which showed

3

Yamamoto putting it into the toothbrush holder. J.R. was scared and deleted the video. She messaged her sister and her friend to tell them about what had happened.

Within a few months, J.R. found another cell phone in the bedroom that she shared with Yamamoto's daughter, M.Y. After coming out of the shower, she noticed the cell phone hidden among M.Y.'s stuffed animals. J.R. viewed the video on the cell phone and again saw Yamamoto starting the recording and placing the phone there. J.R. deleted the video. She did not confront her uncle or tell E.Y. about the videos.

J.R. was still living with Yamamoto and E.Y. when Yamamoto began asking her about her sex life and gave her condoms. In 2013, J.R. moved out of her aunt and uncle's home and went to live with her older sister. Yamamoto continued to send her text messages, and J.R. would sometimes see Yamamoto after school.

After talking to J.R. about "who he can mess around with," including family members and friends, Yamamoto asked J.R. to have sex with him. J.R. agreed because she was afraid to say no and did not know what else to do.

Yamamoto asked J.R. to go to the gym with him and picked her up at her sister's house. J.R. knew that they were not going to the gym, but that Yamamoto was planning to take her somewhere to have sex. Yamamoto drove to his office. No one else was at the office when they arrived. Yamamoto took J.R. into an empty room and had sex with her. J.R. was 17 years old at the time.

Yamamoto and J.R. had sex on multiple occasions at Yamamoto's office, once in the bathroom at Yamamoto's house where J.R. had lived, and once in the kitchen of Yamamoto's new house after the family moved. J.R. could not

4

remember how many times they had sex before she turned 18 years old but knew that it was more than two times. Yamamoto did not wear a condom. One time, J.R. discovered that Yamamoto was video recording her during sex, but Yamamoto deleted the video.

When E.Y. learned of Yamamoto's sexual relationship with J.R., she confronted and mocked J.R. She also told J.R. that she had been fighting with Yamamoto, and E.Y. had bruises from a fight earlier that week.

*Crimes Involving Yamamoto's Daughter*

Yamamoto worked for the Navy Reserve before starting a new job with the Sheriff's Department. He was considered the disciplinarian of the household and typically punished M.Y. and her siblings by making them do "military push-ups" or hitting them. On one occasion, Yamamoto hit M.Y. and three of her siblings with a belt because they had not cleaned their rooms. M.Y. was in elementary school at the time.

M.Y. witnessed Yamamoto fight with her siblings and, one time, put her brother in a chokehold and strangle him with both hands. M.Y. also witnessed Yamamoto's aggression toward her mother. As an example, she recalled that Yamamoto had been fighting with E.Y. and reached over and "grabbed [E.Y.'s] phone really aggressive and he took it away from her," when they were going to pick one of M.Y.'s siblings up from school.

M.Y. knew to follow Yamamoto's orders because if she did not comply, he would get really angry and threaten to hit her with a belt or make her do push-ups. M.Y. felt scared whenever Yamamoto was angry. She believed that if she were to upset Yamamoto, she "would either get beat or [she] would be punished." She knew that Yamamoto had a gun that he kept under his bed. This frightened her and she believed that if Yamamoto became angry

5

with her, he could hurt her "because he was strong, and the fact that he had a gun in the house."

E.Y. testified that the children respected Yamamoto but were "kind of scared of him." Yamamoto experienced mood swings and was "hot and cold," and the children often asked E.Y., "[W]hy daddy is always mad? Why daddy is like this?"

In April 2017, Yamamoto broke his arm in a motorcycle accident. M.Y. was 14 years old, a sophomore in high school at the time, and she wanted to dye her hair. Yamamoto told her that she would only be allowed to dye it if she showered with him. M.Y. was scared but did not know what to do. She did not want to anger Yamamoto, so she complied. Yamamoto undressed and went into the shower in M.Y.'s bedroom. M.Y. was fully clothed when she followed him in. Yamamoto instructed M.Y. to take off her clothing. M.Y. did not want to, but she complied. Yamamoto then told M.Y. to stroke "his dick." M.Y. was in shock and froze. Yamamoto told her that it would be okay and "to just do it." M.Y. touched Yamamoto's penis and then removed her hand, but Yamamoto took her hand and put it back, and told M.Y. "to just finish it." M.Y. looked away and masturbated Yamamoto until he ejaculated. Yamamoto touched M.Y.'s breasts and vagina. He also asked M.Y. to kiss him using her tongue. M.Y. did not try to pull away because Yamamoto was bigger and stronger than her and had already grabbed her hand and put it back on his penis when she tried to stop. She thought that he would grab her if she tried to resist him.

After the shower, M.Y. and Yamamoto went to his room. Yamamoto told M.Y. that he was sorry and that she should call the police on him. He told her that "he would plead guilty at the time." But M.Y. was too afraid to

6

call the police. She felt that reporting Yamamoto would make her family fall apart and "everyone would hate [her]."

On several occasions thereafter, Yamamoto gave M.Y. a sex toy and his laptop with pornography on it. He instructed her to watch the pornography and to masturbate in the bathroom. Yamamoto would wait for M.Y. in her room. M.Y. would turn on the shower and pretend to masturbate because she did not know what else to do.

The following year, in July 2018, M.Y. was a junior in high school and had invited one of her friends to come over. Yamamoto told M.Y. that she could have her friend over "only if you do something for me." E.Y. was at work, but M.Y.'s two younger siblings were at home.

The next day, Yamamoto came into M.Y.'s bedroom and instructed her to go into his room. M.Y. sent a text message to E.Y. that said, "Help." E.Y. responded and asked what was going on. Yamamoto saw M.Y. using her cell phone, grabbed the phone away from her, and put it on his nightstand. In his bedroom, Yamamoto told M.Y. to get undressed. He also undressed. Yamamoto told M.Y. to get on her knees and "suck [his] dick." M.Y. thought that if she refused, Yamamoto would hurt her or she would be punished.

Yamamoto then told M.Y. to get in his bed. Yamamoto got on top of M.Y., touched her breasts, and put his fingers inside of her vagina. M.Y. was scared and thought that if she tried to leave, Yamamoto would grab her and put her back on the bed. Yamamoto then put his mouth on M.Y.'s vagina.

While on top of M.Y., Yamamoto inserted his penis into M.Y.'s vagina. M.Y. froze and could not think. She felt pain and told Yamamoto "that it really hurt and [she] wanted to stop." Yamamoto did not stop. He told M.Y. to kiss him on the mouth using her tongue. Eventually, he told M.Y. to get

up and go into the shower. In the shower, he touched M.Y.'s breasts and vagina and instructed M.Y. to perform oral sex again until he ejaculated.

Afterwards, Yamamoto told M.Y. that this was the last time something like this would happen. M.Y. did not believe him because he had said the same thing after the first incident.

On or around August 9, 2019, M.Y. had a boyfriend at school. Per cultural custom, M.Y. required permission from her parents to go on dates. Yamamoto told M.Y. that if she wanted to go on a date with her boyfriend, she would have to have sex with him first. Yamamoto instructed M.Y. to go into his bedroom, where he told her to get undressed and go into the shower. Yamamoto also undressed and got into the shower, where he started to touch her vagina. Yamamoto put M.Y.'s hand on his penis. He then got out of the shower and told M.Y. to put her mouth on his penis. Yamamoto also put his mouth on her vagina. M.Y. thought that if she did not do what Yamamoto asked, he would hurt her because he was strong and had a gun. Yamamoto then laid down on the floor and instructed M.Y. to get on top of him. He inserted his penis into her vagina and told her to "keep going" until he eventually ejaculated.

On August 22, 2019, Yamamoto looked through M.Y.'s cell phone and saw text messages suggesting that M.Y. and her boyfriend were sexually active. Yamamoto seemed angry that M.Y. was texting her boyfriend, and asked M.Y. "how come [she] doesn't do it to him."

Later that night, Yamamoto turned off the lights in the living room and made M.Y. go behind the couch. Yamamoto pulled his pants down and told M.Y. to "suck it," and to "do it with affection like you're doing it with [your boyfriend]." M.Y.'s mouth was on Yamamoto's penis when a light turned on

8

in the kitchen. Yamamoto told M.Y. that he would just pick her up from school the next day. M.Y. went back to her room.

The following day, Yamamoto sent M.Y. a text message during her lunch hour telling her that he was going to pick her up during fifth period. M.Y. did not reply. A teacher assistant came into M.Y.'s class with a slip that said M.Y. had to take a DMV test. M.Y. went to the school office and saw that Yamamoto was there to pick her up. Yamamoto signed her out and took her home. There was no DMV appointment.

At home, Yamamoto told M.Y. to go straight to his room and undress. Yamamoto touched her vagina and told her to get on the bed. M.Y. laid on the bed, and Yamamoto climbed on top of her and inserted his penis into her vagina. Yamamoto "started making out" with M.Y., using his tongue to kiss her and touching her breasts. M.Y. was in pain and tried to scream, but Yamamoto put his hand over her mouth. M.Y. began to cry. Yamamoto told her "that it will all be over," but did not stop.

M.Y. told Yamamoto that she was feeling pain in her vagina. Yamamoto then grabbed her, flipped her over, and inserted his penis in her anus. M.Y. was in pain and tried to scream, but Yamamoto covered her mouth again. She told Yamamoto that it really hurt. Yamamoto flipped her back over and inserted his penis into her vagina. He told M.Y., "If you cry . . . I can't cum." Yamamoto ejaculated inside of M.Y. He told her that a condom was unnecessary because he had had a vasectomy. Yamamoto told M.Y. that this would be the last time.

On August 24, 2019, M.Y. told E.Y. that she had a urinary tract infection. E.Y. asked her whether M.Y. had had sex before, but M.Y. said no. Then E.Y. asked M.Y. whether "[her] dad did this." M.Y. said no because she was scared and nervous to tell her mother.

9

The next day, M.Y.'s boyfriend asked Yamamoto for permission to take M.Y. out, but Yamamoto was hostile toward him. So, M.Y.'s boyfriend told M.Y. that he did not want to hang out anymore. M.Y. felt "fed up with everything" and "wanted everything to end." Believing that no one would believe her or listen to her if she exposed Yamamoto's abuse, she decided to commit suicide. However, she called a suicide hotline and then fell asleep.

The next day at school, M.Y. was crying and her friends asked her what was wrong. She told her friends that her father had been raping her. Her friends reported the abuse to school counselors. M.Y. was called into the office the following day. A counselor asked M.Y. about the situation and M.Y. shared that Yamamoto had been sexually abusing her. The counselor then called the police, and M.Y. told an officer and a detective about the abuse.

*Defense*

Yamamoto testified that he had a good, loving relationship with his children. He would give them "a little swat on the butt" when they were younger, but later stopped using physical discipline and instead used exercises as discipline. He denied ever hitting M.Y.'s brother or putting him in a chokehold, but said that he and the boys had "little wrestling matches." He had a good relationship with M.Y. until the day before she disclosed her allegations. Before that, they had never "butt[ed] heads." Their relationship changed when M.Y. "really came at" Yamamoto.

Yamamoto and E.Y. had marital problems and frequently fought about money. Sometimes, the fights turned violent, with E.Y. throwing things and Yamamoto restraining her.

Yamamoto recalled going through M.Y.'s text messages with her boyfriend, which indicated that M.Y. was sexually active. He told M.Y. to practice safe sex and that he "wasn't going to take care of her kids if she had

one." M.Y. asked Yamamoto to help her get out of taking a test the next day by picking her up early from school. Yamamoto agreed and picked M.Y. up. On the school sign-out slip, Yamamoto wrote that M.Y. had a DMV test as an excuse. After they got home, Yamamoto played video games and M.Y. went to her room. Yamamoto then took M.Y. to drop off pizza for her little sister.

Yamamoto was shocked when he was apprehended by police officers at M.Y.'s school. After an emergency protective order and a temporary restraining order were issued protecting M.Y., Yamamoto moved out of the family house. He started talking with E.Y. and meeting her in local parking lots or shopping plazas to talk.

On September 10, 2019, Yamamoto attempted suicide because E.Y. told him that it was "better if you left your kids something instead of nothing." After Yamamoto's suicide attempt, on September 16, 2019, E.Y. came to visit Yamamoto at the casino hotel where he was staying. She told him that if his story did not corroborate or match M.Y.'s, she would divorce him and take the kids. Yamamoto suspected that E.Y. was trying to record him at that time, but he admitted to having sex with M.Y. because he did not want to get divorced.

Two days later, on September 18, 2019, Yamamoto met E.Y. in a McDonald's parking lot. He confessed to having sex with M.Y. three times. E.Y. had recorded the conversation. Yamamoto testified that he "[did not] remember saying it, but I heard the recording and that is my voice on the recording." Yamamoto again claimed that he confessed because he did not want E.Y. to leave him. Yamamoto was "really just pissed off at the allegations" and punched the dashboard in anger.

At trial, Yamamoto denied ever taking a shower with M.Y., engaging in any sexual activity with her or encouraging her to masturbate, providing her

11

with sex toys, or making her watch pornography. Yamamoto also denied putting a phone in the shower or in J.R.'s bedroom to record her. Yamamoto had never looked at J.R. in a sexual way until after she turned 18 years old. At some point, however, the uncle-niece relationship evolved into Yamamoto "cheating on" his wife with J.R. He could not remember exactly how he and J.R. got together but knew that "one thing led to another and [they] started going out and having sex." Yamamoto characterized his relationship with J.R. as a consensual affair, which strained his marriage after E.Y. found out. Ultimately, Yamamoto chose to stay with his family rather than leave them for J.R.

## DISCUSSION

## I

## INEFFECTIVE ASSISTANCE OF COUNSEL

Under *Strickland v. Washington* (1984) 466 U.S. 668 (*Strickland*), to prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that trial counsel's performance was deficient, and that this deficient performance resulted in prejudice. (*Id.* at p. 687.) With respect to the performance prong, a reviewing court "indulge[s] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" (*id.* at p. 689) and measures an attorney's performance against an "objective standard of reasonableness" (*id.* at p. 688). To establish that defense counsel rendered deficient performance under *Strickland*, a defendant must demonstrate that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." (*Id.* at p. 687.) "On direct appeal, a finding of deficient performance is warranted where '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission,

12

(2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' [Citation.] '[W]here counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.' " (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165; *People v. Cunningham* (2001) 25 Cal.4th 926, 1003 ["deficient performance [must be] based upon the four corners of the record"].) Therefore, without some indication in the record that counsel's decision was not tactical, a reviewing court is not justified in finding deficient performance on direct appeal.[3] (See *Mendoza Tello, supra,* 15 Cal.4th at pp. 266-267; *People v. Scott* (1997) 15 Cal.4th 1188, 1212 ["If the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation"].)

With respect to the prejudice prong, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland, supra,* 466 U.S. at p. 694.) A defendant "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." (*Id.* at p. 693.) Rather, a defendant must show "a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.)

---

3    Accordingly, it is "particularly difficult" for a defendant to prevail on direct appeal on a claim of ineffective assistance by trial counsel (*People v. Mai* (2013) 57 Cal.4th 986, 1009), and such claims are more "appropriately decided in a habeas corpus proceeding" (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267 (*Mendoza Tello*).

13

Here, the primary thrust of Yamamoto's appeal concerns his claim that his trial counsel was constitutionally ineffective because he did not object to: (1) his confessions, (2) hearsay statements contained in a detective's testimony at trial, (3) hearsay statements from J.R., and (4) evidence of Yamamoto's prior acts of domestic violence. We address each of these claims in turn.

## A. Yamamoto's Confessions

### 1. Yamamoto's Contentions

Yamamoto argues that his trial counsel performed deficiently because he did not move to suppress Yamamoto's confessions. Specifically, Yamamoto contends both his unrecorded and recorded confessions were involuntary because he was motivated by fear of divorce and not seeing his children.

### 2. Background

After M.Y. disclosed Yamamoto's abuse to school counselors and the police, an emergency protective order was issued, and Yamamoto moved out of the family home. Detective Rubidia Lopez-Ng asked E.Y. to meet with Yamamoto and record their conversation. E.Y. agreed to do so.

Yamamoto and E.Y. had multiple interactions in which E.Y. would ask Yamamoto to tell her what he did with M.Y. and J.R. According to Yamamoto, he consistently denied any inappropriate conduct with M.Y. or J.R. However, finally he stopped denying the allegations during two conversations with E.Y.

On September 16, 2019, E.Y. met Yamamoto at a casino where he was staying.[4] She turned on her phone recorder and put it inside her purse. E.Y.

---

[4]  Previously, Yamamoto tried to commit suicide by overdosing on Tylenol. After Yamamoto was discharged from the hospital, a relative got him a hotel room at a casino.

and Yamamoto had a conversation wherein Yamamoto admitted "that something happened to him and [M.Y.] and he didn't know what he's doing." However, E.Y. did not recall the specifics of the conversation, and the phone recorder did not record the conversation.

Per Lopez-Ng's request, E.Y. agreed to meet with Yamamoto again and try to record their conversation. Lopez-Ng did not tell E.Y. what questions to ask but conveyed that it was important to get Yamamoto to be "as specific as possible or as much as possible" concerning what he did to M.Y.

On September 18, 2019, E.Y. met with Yamamoto in a McDonald's parking lot while inside her car. Because she was concerned that Yamamoto would check her for a recording device, she put her phone under the driver's seat.[5] From the beginning of their conversation, Yamamoto was suspicious that E.Y. was recording the conversation. In fact, he asked, "[W]here is your recorder at?"

At first, Yamamoto denied M.Y.'s allegations. When E.Y. said that M.Y. was only 14 years old when Yamamoto began to have sex with her, Yamamoto became very angry. He mentioned the possibility of an enhancement: "Is she trying to get me on the enhancements? Fuck off, [M.Y.], fuckin' bitch. I ain't fuckin' gonna go to jail on fuckin' fourteen. Fuck you." Yamamoto repeatedly denied that he had sex with M.Y., especially at Casa Lago.[6] Moreover, in his denial, he became irate and twice threatened to "beat the fuck out of [M.Y.]"

---

[5]     The phone successfully recorded E.Y. and Yamamoto's conversation, which was transmitted to the police. The recording was admitted into evidence during Yamamoto's trial.

[6]     The family lived in a home in the Casa Lago neighborhood from 2013 until 2018.

15

Nonetheless, Yamamoto eventually admitted to having sex with M.Y. when she was 16 years old, stating, "I already told you it was at Yale."[7]  E.Y. asked Yamamoto how many times he had sex with M.Y., and he replied that it was "[t]hree times total" and he only showered with her at Casa Lago. Further, Yamamoto insisted that he did not touch M.Y. inappropriately until she was older and accused somebody of coaching M.Y. "to put [him] away under the 14 year old . . . rule."  Yamamoto cautioned E.Y. that she was not getting a confession from him.

Yamamoto denied ever raping M.Y., claiming he did not "force her" and did not "put her into fear, like, I'm going to fuckin' kill you."  When E.Y. pointed out that M.Y. was only 16 years old, Yamamoto replied, "Okay, it's statutory rape, one year, fucking technical."  He said he was diseased, sick in the head, and a "nympho."

Yamamoto was uneasy about being recorded throughout his conversation with E.Y. and called her a liar repeatedly.  He was upset about the allegations and punched the car's dashboard.  Finally, he told E.Y. to bring M.Y. to him so he could apologize.  He did not want to say explicitly what he needed forgiveness for and asked E.Y. why she wanted him to be so specific.

Later during the conversation when Yamamoto again asked E.Y. to bring M.Y. to him, E.Y. said, "So you're just going to hurt her.  You're just going to choke her."  Yamamoto did not directly respond to E.Y.'s allegations but repeated the fact that E.Y. wanted him to apologize to M.Y.

At trial, Yamamoto testified that he only confessed when he met E.Y. on September 16 because she threatened to divorce him and "take the kids" if

---

7    The family moved from Casa Lago to Yale Street in 2018.

16

his story did not match what she knew. Specifically, Yamamoto asserted that his wife told him, " 'It's going to be okay. I just want this to be over. Just, you know, tell me what you did.' " He further testified that E.Y. threatened him as follows: " 'If your stories don't corroborate or if they don't match what I'm hearing or what I know, then it's over. Divorce.' " Yamamoto explained that he believed if he did not confess, E.Y. would "leave [him] and take the kids."

Yamamoto therefore claimed that he just told E.Y. what she wanted to hear during both the September 16 and September 18 conversations. To this end, during the September 16 conversation, Yamamoto testified that he said to E.Y., " 'What do you want to hear? I don't know what you want to hear. Do you want to hear me say it? Okay, then.' . . . 'Yeah. Sure. I fucked her.' " He further testified that he did not provide any other details beyond that statement and that he made the statement because he "wanted it to be over," "wanted to go home," "wanted to see [his] kids," and "wanted [his] life back." He referred to the ordeal as a "nightmare." He also emphasized that he did not want his wife to leave him.

Yamamoto also claimed that, when he talked to E.Y. on September 18, his "mind wasn't in the right place." He could not explain why he admitted some allegations while denying others. In addition, Yamamoto testified that he heard his statements on the recording played for the jury, but he did not remember making many of the statements that were recorded. Moreover, he explained that he was angry in response to the allegations and said "anything [he] thought [E.Y.] wanted to hear so it would end."

### 3. Analysis

Yamamoto argues his trial counsel was ineffective for failing to object to the admission of his statements to E.Y. on the grounds that the statements

were involuntary.[8]  He asserts E.Y. was acting as an agent of the police both times she talked to him.  Accordingly, his statements were involuntarily obtained.  We find no merit in Yamamoto's contentions.

Had counsel objected to the admission of Yamamoto's statements to E.Y. on involuntariness grounds, the prosecution would have been required to establish by a preponderance of the evidence that the statements in the conversations were voluntary and not obtained as a result of police coercion. (*People v. Massie* (1998) 19 Cal.4th 550, 576; *People v. Maury* (2003) 30 Cal.4th 342, 404 ["finding of coercive police activity is a prerequisite to a finding that a confession was involuntary under the federal and state Constitutions"].)  "Under both state and federal law, courts apply a 'totality of circumstances' test to determine the voluntariness of a confession. [Citations.]  Among the factors to be considered are ' "the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity" as well as "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health." ' [Citation.]  . . .  In determining whether a confession was voluntary, '[t]he question is whether defendant's choice to confess was not "essentially free" because his will was overborne.' [Citation.]" (*Massie*, at p. 576.)  "A confession may be found involuntary if extracted by threats or violence,

_____

[8]     Yamamoto's trial counsel objected to the admission of the recorded confession as illegally obtained under section 632, which prohibits the intentional recording of a confidential conversation without the consent of all parties to the conversation.  (See § 632, subd. (a).)  Counsel also argued that the court should not admit the recording under Evidence Code section 352 because Yamamoto was prepared to testify about the conversation.  As such, the record indicates that defense counsel debated the admissibility of the recorded conversation and moved to exclude it under two separate grounds. Thus, it appears that his decision not to argue the confession was involuntary was a tactical one.

18

obtained by direct or implied promises, or secured by the exertion of improper influence." (*Maury*, at p. 404.)

For example, psychological coercion can result in involuntary confessions. (See *Arizona v. Fulminante* (1991) 499 U.S. 279, 285-287.) There, the defendant confessed to a murder after a fellow inmate, acting on behalf of the police, offered to help the defendant get protection from other inmates if the defendant confessed. (*Id.* at p. 283.) At the time, the defendant had been beginning to receive rough treatment from other inmates because there was a rumor that he had killed a child. (*Ibid.*) The Supreme Court found there was a credible threat of violence against the defendant, which motivated the defendant's confession and rendered it the product of coercion. (*Id.* at p. 288.)

Assuming without deciding that E.Y. was acting as an agent of the police when she spoke to Yamamoto at the casino on September 16 and then in her car in the McDonald's parking lot on September 18, the totality of the circumstances surrounding both conversations does not reveal coercive conduct that calls into question the voluntary nature of Yamamoto's confessions.

During the September 16 conversation at the casino, it is less than clear what exactly Yamamoto admitted to. That conversation was not recorded, and, at trial, E.Y. could not recall any specifics of what Yamamoto said. Indeed, E.Y. simply testified that Yamamoto admitted "that something happened to him and [M.Y.] and he didn't know what he's doing." This lack of specificity is corroborated by Yamamoto's own trial testimony wherein he stated that he told E.Y. that he "fucked" M.Y. but did not provide any details aside from that statement. Thus, based on the testimony of both E.Y. and Yamamoto, it does not appear that, during the September 16 conversation,

19

Yamamoto confessed in any sort of detail to what he did to M.Y. or J.R. beyond a somewhat flippant statement, " 'What do you want to hear? I don't know what you want to hear. Do you want to hear me say it? Okay, then. . . . Yeah. Sure. I fucked her.' "

Nonetheless, it was during this September 16 conversation that Yamamoto claims he was subjected to psychological coercion and threats because E.Y. was threatening to leave him and take their children if what he said did not "corroborate" or "match" what E.Y. had heard or knew. Yet, there is no indication that during the September 16 conversation that Yamamoto admitted to any specific occurrences beyond stating that he had sex with M.Y. In fact, Yamamoto testified that E.Y. asked about specific events like having sex with M.Y. in the bathroom floor or on their bed as well as M.Y. masturbating Yamamoto in the shower. But Yamamoto did not admit to any such details during the September 16 conversation.

Additionally, E.Y.'s testimony contradicted Yamamoto's testimony regarding any threats of divorce during the September 16 conversation. According to E.Y., she and Yamamoto discussed divorce at some point during one of their meetings, but the discussion was unrelated to M.Y.'s allegations. To this end, E.Y. testified: "I told him that I would stay with him if he [would] sign the power of attorney that I needed . . . to withdraw the [retirement] contribution and to get a new military I.D. for the kids and also to amend the tax return 2019." E.Y. also told Yamamoto that she would bring the children to see him after he signed the power of attorney; however, the children would ultimately decide if they wished to see him. She testified that she did not condition staying married to Yamamoto to anything related to the criminal allegations against him.

Only looking at the September 16 conversation, we see little evidence that Yamamoto's statements to E.Y. were involuntary. Yamamoto claims that E.Y. threatened to divorce him unless he corroborated what she knew or heard. And although she offered specific details about his interactions with M.Y., it does not appear that Yamamoto made any statement to confirm what E.Y. knew beyond a generic statement that "something happened" (according to E.Y.) or that he "fucked" M.Y. (according to Yamamoto). Moreover, the lack of any evidence that Yamamoto's statements to E.Y. were involuntary is underscored by the recording of the September 18 conversation.

There is no evidence whatsoever of E.Y. making any threats during the September 18 conversation. The recording begins with Yamamoto getting into E.Y.'s car and ends with him leaving. Not once is divorce mentioned. E.Y. does not warn Yamamoto that she is not going to let him see the kids unless he confesses.

Additionally, Yamamoto clearly believes that E.Y. is recording their conversation. He asks E.Y., "[W]here is your recorder at?" Later during the conversation, apparently in response to Yamamoto looking all around, E.Y. tells Yamamoto to search the car for a recording device. And when Yamamoto denies that he had sex with M.Y. when she was 14, he states, "I hope you're recording this too." Therefore, the recording shows that, at the very least, Yamamoto suspected his conversation with E.Y. was being recorded. Thus, Yamamoto appears to have been at least somewhat sophisticated in understanding that his conversation with E.Y. was being recorded (his knowledge is further underscored by his experience in law enforcement).

Also, Yamamoto's tone in the recorded conversation undermines his claim that he confessed because he was trying to save his marriage.

21

Throughout the conversation, Yamamoto hurled profanities and insults at E.Y., saying "fuck you" multiple times, calling her a liar and a "fuckin' bitch," and threatening to "beat the fuck out of" M.Y. In fact, Yamamoto's attitude during the entire conversation is aptly described as combative with no indication that he was simply telling E.Y. what she wanted to hear. To the contrary, he appeared to be fighting E.Y. with every question she asked.

Further, the recording belies Yamamoto's claim that he felt compelled to corroborate M.Y.'s story to placate E.Y. Throughout the recording, Yamamoto vehemently denied many allegations while alluding to the fact that he committed others (but often minimizing his actions). He was most emphatic in denying that he ever had sex with M.Y. while she was 14 years old: "Fuck that. You're not getting a confession. Fuck you." Such comments hardly seem consistent with someone who was trying to say whatever E.Y. wanted to hear. Moreover, at trial, Yamamoto was unable to explain why he admitted to some accusations but not others.

Also, other circumstances undercut Yamamoto's claim his statements to E.Y. were not voluntary. Both conversations occurred in areas where Yamamoto was free to leave at any time he decided to do so. He appeared acutely aware of what was being alleged against him. For example, he noted the difference in a claim that he had sex with M.Y. when she was 14 years old as compared to 16 years old, saying that he was not "getting" a "14-year enhancement." He also was aware that statutory rape was not as serious of a crime as forcible rape. And he would begrudgingly admit to the less serious crimes while vehemently denying the more severe allegations. Further, his hostile tone with E.Y. indicated that he was not intimidated or cowered by her.

Against this background, we conclude that any objection to the admission of the September 16 and 18 conversations between Yamamoto and E.Y. on the grounds that Yamamoto's statements were involuntarily obtained as the result of coercive police conduct would have failed. Counsel is not ineffective for failing to bring a meritless challenge to admissible evidence. (*People v. Hart* (1999) 20 Cal.4th 546, 629.)

## B. Hearsay Evidence Concerning Count 6

### 1. Yamamoto's Contentions

Yamamoto argues his trial counsel was constitutionally ineffective because he did not object to Lopez-Ng's testimony regarding E.Y.'s statement that Yamamoto performed oral sex on her on August 8 (count 6). We reject this contention. On the record before us, we cannot say that there was no tactical reason for counsel's decision not to object to the evidence.

### 2. Background

Among other crimes, Yamamoto was charged with two acts of forcible oral copulation occurring on August 8, 2019.[9] Count 5 constituted the "first time," and Count 6 was based on the "last time."

Lopez-Ng was a family protection unit detective for the Chula Vista Police Department and the lead investigator in the instant matter. As part of her investigation, she conducted several interviews with M.Y. Lopez-Ng audio recorded the interviews and reviewed the recordings before testifying at trial. She also wrote a summary report of her interviews with M.Y.

At trial, on August 26, 2021, M.Y. had difficulty remembering whether Yamamoto sexually abused her on certain dates. The prosecution asked

---

[9] The second amended information alleged that Yamamoto committed these offense on August 9, 2019. However, the trial evidence indicated that the correct date was August 8, 2019.

whether it would help refresh M.Y.'s recollection to see a summary of her statement to Lopez-Ng, which she provided in August 2019. M.Y. responded in the affirmative and reviewed the statement. After she reviewed the statement, the prosecution asked M.Y. whether it helped her remember whether there was another time "where your father had sexual intercourse with you." M.Y. said that it did and testified that Yamamoto had sex with her on the same date as her school's open house (August 8, 2019).

M.Y. continued to recall other details of the abuse that day, but when the prosecution asked whether Yamamoto had put his mouth on her vagina on August 8, 2019, M.Y. responded, "I cannot remember." However, she did remember that she orally copulated Yamamoto that day.

When Lopez-Ng subsequently testified regarding what occurred on August 8, 2019, she testified as follows: "[W]hen we asked [M.Y.] what body parts went in, it was fingers and then, you know, mouth to vagina, his mouth to her vagina and then penis to vagina."

Yamamoto's trial counsel did not object to this portion of Lopez-Ng's testimony.

During his closing argument, Yamamoto's trial counsel told the jury that he was not going to review the evidence "charge by charge, witness by witness," but instead, would "focus" the jury's "attention on some issues in this case." To this end, he argued that there was no evidence that Yamamoto ever used force against M.Y. He also emphasized there was a lack of evidence that M.Y. submitted to any act with Yamamoto based on duress.

However, one of defense counsel's primary arguments was that the sex acts never happened. Thus, counsel pointed out the lack of physical evidence that any sexual contact occurred. Yamamoto's trial counsel also highlighted

24

the inconsistencies in M.Y.'s testimony and specifically how her testimony contradicted Lopez-Ng's testimony.

### 3. Analysis

Here, Yamamoto argues his trial counsel was ineffective because he failed to object to the admission of Lopez-Ng's hearsay statement that M.Y. told her that mouth to vagina contact occurred on August 8, 2019. Further, Yamamoto claims that there could be no rational tactical reason for not objecting to this evidence because it was the only evidence offered to prove count 6. We disagree.

On this record, we cannot rule out the possibility that defense counsel chose not to object to Lopez-Ng's testimony as part of his overall trial strategy. During closing argument, counsel argued that Yamamoto did not sexually abuse M.Y. whatsoever and explicitly challenged M.Y.'s credibility. Thus, he compared the difference in what M.Y. told Lopez-Ng and what she testified to at trial. As such, it might have been that Yamamoto's trial counsel made the strategic decision to allow Lopez-Ng to testify regarding M.Y.'s previous statements to underscore his theory that M.Y. was not believable. Further supporting this tactical decision, as the People suggest, defense counsel might have been concerned that had he objected to Lopez-Ng's testimony, the prosecution simply would have put M.Y. back on the stand and refreshed her recollection yet again with Lopez-Ng's summary report. In doing so, that particular statement would have been highlighted for the jury and the jury would have heard M.Y. herself testify about the mouth to vagina contact. Yamamoto maintains that the People's argument is speculative because we cannot possibly know what the prosecution might have done. True, there is some speculation in the People's argument, but that speculation is inherent in almost any ineffective assistance counsel

25

challenge on direct appeal as often we cannot rule out, based on the four corners of the appeal, the possibility that counsel had a tactical reason for not objecting. (See *Mendoza Tello*, *supra*, 15 Cal.4th at pp. 266-267; *People v. Scott*, *supra*, 15 Cal.4th at p. 1212.)

Therefore, on the record before us, we conclude there was a possible rational tactical reason for not objecting to Lopez-Ng's testimony regarding what M.Y. told her about mouth to vagina contact, and we cannot find ineffective assistance of counsel based solely on the appellate record as to this issue. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1052 [reviewing court will find ineffective assistance of counsel " ' "only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission" ' "].)

### C. Hearsay Statements Related to Counts 28 and 29

#### 1. Yamamoto's Contentions

Yamamoto next contends his trial counsel was constitutionally ineffective because he did not object to certain hearsay statements that J.R. made to Lopez-Ng. On the record before us, we cannot determine that defense counsel was constitutionally ineffective for failing to object to such evidence.

#### 2. Background

At trial, J.R. testified that Yamamoto took her to his office and had sex with her when she was younger than 18 years old and that she had sex at least once more before she turned 18.

Regarding J.R, the prosecution asked Lopez-Ng how she learned that J.R. was a victim. She responded that E.Y. told her "that she 100 percent believed her daughter about what happened because Mr. Yamamoto had

26

done the same thing to their niece [J.R.] when [J.R.] was living with them." Yamamoto's trial counsel did not object to this answer.

Lopez-Ng also testified about her discussions with J.R. and explained that J.R. told her that Yamamoto picked her up to go to the gym but instead took her to his office and had sex with her. Lopez-Ng also testified that she focused on when sexual intercourse occurred and said that J.R. stated she had sex with Yamamoto five or six times. Defense counsel did not object to Lopez-Ng's testimony.

However, during cross-examination, Yamamoto's trial counsel asked Lopez-Ng about her conversations with J.R. Specifically, counsel asked Lopez-Ng if J.R. described her relationship with Yamamoto like it was a "boyfriend/girlfriend relationship." Defense counsel got Lopez-Ng to admit that J.R. told her that Yamamoto treated her like a girlfriend and would buy her food after school. In response to defense counsel's questions, Lopez-Ng testified that Yamamoto often picked up J.R. from school when she had a free sixth period and took her to his office.

At trial, Yamamoto claimed that he had a romantic, sexual relationship with J.R., but they did not begin having sex until J.R. was 18 years old. Yamamoto's trial counsel reiterated Yamamoto's version of events during this closing argument as he reminded the jury:

> "He made himself vulnerable. He admitted to a romantic sexual relationship with his niece. That is something that society frowns upon, something that most of you, I'm sure, are not okay with, but he was vulnerable and opened himself up and admitted to that. He owned that. But another thing that he is adamant about is that he did not begin any sexual relationship with her until after her 18th birthday."

Thus, defense counsel's strategy regarding the claims against Yamamoto relating to J.R., which included counts 28 and 29, was to concede that

27

Yamamoto and J.R. had a sexual relationship but argue that relationship was akin to a boyfriend/girlfriend relationship that did not begin until after J.R. was 18 years old.

### 3. Analysis

Here, Yamamoto argues that the challenged Lopez-Ng testimony was inadmissible hearsay, and there was "no conceivable tactical reason for failing to object to the hearsay evidence." The People concede that J.R.'s prior statements to Lopez-Ng constituted hearsay that was inadmissible under Evidence Code section 791. They do, however, posit that J.R.'s prior statements might have been admissible under a different hearsay exception. Yet, we need not consider other possible hearsay exceptions because, even if we assume the challenged testimony was inadmissible hearsay, we nonetheless conclude Yamamoto has not shown that his trial counsel was ineffective for failing to object to the testimony.

We disagree with Yamamoto that there was no reasonable tactical reason for failing to object. Below, defense counsel chose to question Lopez-Ng regarding the content of her interviews with J.R. To this end, he got Lopez-Ng to admit that J.R. characterized her relationship with Yamamoto like they were boyfriend and girlfriend. Perhaps, Yamamoto's trial counsel was concerned that if he objected to Lopez-Ng testifying about her conversations with J.R. during Lopez-Ng's direct examination, he would not have had the opportunity to elicit her admission that J.R. referred to her relationship with Yamamoto in conventional terms. Thus, on this record, we cannot determine Yamamoto's counsel was constitutionally ineffective. (See *People v. Bradford, supra*, 14 Cal.4th at p. 1052.)

Additionally, Yamamoto has not shown that he was prejudiced by his attorney's failure to object to the evidence. Here, Yamamoto argues that

28

J.R.'s prior statements were prejudicial because they "unfairly corroborated" J.R.'s trial testimony. Not so. At trial, Yamamoto conceded that he had a sexual relationship with J.R. Therefore, as to Yamamoto's crimes against J.R., the contested issue was when sexual intercourse between the two occurred. Yamamoto does not point to any portion of the challenged evidence that established when Yamamoto and J.R. had sexual intercourse. Thus, at most, Lopez-Ng's testimony corroborated the fact that Yamamoto and J.R. had sex. However, Yamamoto conceded that issue at trial. Thus, on this record, we are not persuaded that Yamamoto has shown "but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.)

### D. Evidence of Prior Acts of Domestic Violence

#### 1. Yamamoto's Contentions

Yamamoto argues that his trial counsel performed deficiently when he did not object to E.Y.'s testimony at trial describing Yamamoto's acts of physical violence against her. Specifically, Yamamoto maintains that the evidence was inadmissible under Evidence Code sections 350, 1101, and 352. We disagree.

#### 2. Background

At trial, M.Y. testified that she was afraid of Yamamoto and complied with his requests for sex because she thought that Yamamoto might hit her with a belt or punish her if she tried to resist him. Yamamoto "was strong" and had a gun in the house, which frightened M.Y. M.Y. stated that Yamamoto had hit her with a belt before for failing to clean her room, she had seen Yamamoto hit her siblings and, on one occasion, she witnessed Yamamoto strangle her brother "in a chokehold" with both hands. M.Y. also

29

saw Yamamoto argue with E.Y., and on one occasion, she observed Yamamoto take E.Y.'s cell phone away in a "really aggressive" manner.

E.Y. testified that the children were "kind of scared" of Yamamoto, and would ask her why Yamamoto was mad all the time. She also stated that even though her relationship with Yamamoto soured, she stayed with him for the children's sake and because she would be unable to financially support herself if she and Yamamoto were to divorce.

When E.Y. learned about Yamamoto's sexual relationship with J.R., she got "very, very aggressive about it" with Yamamoto, and was "nagging" Yamamoto to find out the truth about what had happened between them. She testified that Yamamoto used his law enforcement experience to stop her by putting her on the floor with her hands behind her back, which caused her multiple bruises. Regarding this interaction, E.Y. described herself as "kind of violent too."

J.R. testified that when E.Y. confronted her about her relationship with Yamamoto, E.Y. told her that she had bruises from a fight with Yamamoto earlier that week. The jury also heard E.Y.'s recorded conversation with Yamamoto, in which Yamamoto threatened to "beat the fuck out of" M.Y. multiple times and called her a "fuckin' bitch," insulted E.Y., and punched the dashboard in anger. Yamamoto asked E.Y. to bring him M.Y. so that he could apologize to her. E.Y. responded, "So you're just going to hurt her. You're just going to choke her."

When E.Y. testified at trial, the prosecution asked her why she thought that Yamamoto was going to choke M.Y. E.Y. replied that during another fight about J.R., "He choked me one time. I remember because I ran away." E.Y. recalled that Yamamoto wrapped one of his hands around her neck to strangle her.

30

### 3. Analysis

Here, Yamamoto argues that his trial counsel was ineffective because he did not object to the admission of evidence of his prior acts of violence against E.Y. To this end, he claims the evidence was inadmissible under Evidence Code sections 350, 1101, and 352. We will address each of these code sections in turn.

Yamamoto first argues the evidence of his prior acts of abuse against E.Y. was inadmissible under Evidence Code section 350. That section provides: "No evidence is admissible except relevant evidence." (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Further, " '[a] trial court has "considerable discretion" in determining the relevance of evidence.' " (*People v. Jones* (2017) 3 Cal.5th 583, 609.) And the test of relevance is whether the evidence tends " ' "logically, natural, and by reasonable inference' to establish material facts such as identity, intent, or motive. [Citations.]' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1166-1167.)

In the instant action, the prior bad acts evidence consists of testimony regarding two events. First, in response to E.Y. being aggressive and violent toward Yamamoto about his interactions with J.R., Yamamoto used his law enforcement tactics to restrain E.Y. Second, Yamamoto once choked E.Y. As we discuss *post*, evidence of both of these acts was relevant.

E.Y.'s testimony about Yamamoto restraining her on the floor was relevant because it tended to show that Yamamoto was capable of physically harming members of his family and that M.Y.'s fear of Yamamoto was credible. Even if M.Y. did not personally witness Yamamoto restraining E.Y.,

31

the evidence helped lay the foundation of M.Y.'s home environment for the jury. Additionally, the evidence tended to illustrate the relationship between E.Y. and Yamamoto. One of Yamamoto's arguments challenging the believability of the recording of his September 18 conversation with E.Y. was his claim that he simply said what E.Y. wanted to hear to maintain their marriage. Certainly, the altercation in which E.Y. was violent toward Yamamoto and Yamamoto subdued her underscores that the couple could be physically violent toward each other. Such an event helped the jury to evaluate whether Yamamoto was being truthful when he claimed he confessed to certain acts with M.Y. just to stay married to E.Y. In other words, in his relationship with E.Y., has Yamamoto shown himself to be the type of person who simply does what he thinks his wife wants him to do or say? Further, E.Y. described Yamamoto as using a law enforcement technique. Yamamoto's willingness to do so buttressed M.Y.'s testimony that Yamamoto was a disciplinarian who made the children do "military style" push-ups as punishment and kept his service weapon under his bed, which frightened M.Y.

E.Y.'s testimony that Yamamoto choked her also was relevant because, like the first prior act, it tended to show the dynamics of the relationship between E.Y. and Yamamoto. Moreover, the evidence related to E.Y.'s credibility during the recording of the September 18 conversation wherein Yamamoto told E.Y. to bring M.Y. to him so he could apologize, and E.Y. responded that Yamamoto was "just going to choke her." When she was questioned at trial why she would make that comment, she recalled the choking incident between her and Yamamoto. Thus, E.Y.'s testimony about the choking incident was relevant both to her state of mind on September 18 when she made the choking comment to Yamamoto's and E.Y.'s credibility.

32

Having concluded the two prior bad acts were relevant, we next consider whether the evidence was inadmissible under Evidence Code section 1101.  Evidence that a defendant committed prior bad acts is inadmissible when offered solely to prove the defendant's criminal disposition to commit such an act (Evid. Code, § 1101, subd. (a); *People v. Ewoldt* (1994) 7 Cal.4th 380, 393, 399), but it is admissible "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . .) other than [the defendant's] disposition to commit such an act." (Evid. Code, § 1101, subd. (b).)  In the instant action, the prior bad acts evidence was not offered to prove Yamamoto's criminal disposition to commit a similar act.  Rather, as we discussed *ante*, the evidence was offered to show the dynamics of Yamamoto's marriage to E.Y., E.Y.'s state of mind when she made certain comments during the September 18 recorded conversation, and the family environment of Yamamoto's home.  As such, the challenged evidence was not inadmissible under Evidence Code section 1101.

Finally, we disagree with Yamamoto that the prior bad acts evidence would have been excluded under Evidence Code section 352 had his trial counsel objected on those grounds below.  "Under Evidence Code section 352, the probative value of the proffered evidence must not be substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.)  " ' "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual *and which has very little effect on the issues*." ' " (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214.)

33

Here, the prior bad acts evidence is not nearly as inflammatory as the offenses alleged against Yamamoto. Yamamoto was charged with molesting his daughter and niece multiple times in various ways. The fact that he restrained his wife when she was being violent toward him and choked her once pales in comparison to the violent, sexual acts he committed against two minors. Further, on the recording of the September 18 conversation between E.Y. and Yamamoto, Yamamoto threatened to beat M.Y. multiple times based on the allegations against him. Yamamoto's anger and apparent willingness to hurt his daughter is much more incendiary than the two prior bad acts.

Additionally, the prior bad acts evidence was probative of important issues at trial, i.e., the dynamics of Yamamoto's marriage to E.Y., E.Y.'s state of mind when she made certain comments during the September 18 recorded conversation, and the family environment of Yamamoto's home. Consequently, the admission of the challenged evidence did not run afoul of Evidence Code section 352.

Because we conclude the prior bad acts evidence was admissible under Evidence Code sections 350, 1101, and 352, Yamamoto has not shown that his trial counsel was constitutionally ineffective for failing to object to the admission of that evidence. (See *People v. Hart, supra*, 20 Cal.4th at p. 629.)

## II

## CUMULATIVE ERROR

Yamamoto maintains that, taken together, the multiple errors constitute cumulative error that warrants reversal. We disagree. Yamamoto's claims of multiple error hinge entirely upon a finding that his counsel was constitutionally ineffective on several fronts. We found no merit to any of Yamamoto's claims that his counsel was ineffective. "A predicate to

34

a claim of cumulative error is a finding of error." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.)  Because we do not find any error, we also do not find any cumulative error that warrants reversal.  (*Ibid.*; see *People v. Duff* (2014) 58 Cal.4th 527, 562 ["In the absence of error, there is nothing to cumulate."].)

## III

## SENTENCING ISSUES

### A.  Yamamoto's Contentions

Yamamoto argues that even if we do not reverse any of his convictions, we must remand this matter to the trial court for resentencing consistent with Senate Bill No. 567 (Stats. 2021, ch. 731, § 1.3) (Senate Bill 567), Assembly Bill No. 124 (Stats. 2021, ch. 695, § 5.3) (Assembly Bill 124), and Assembly Bill No. 518 (Stats. 2021, ch. 441, § 1) (Assembly Bill 518).  We agree that remand is required under Senate Bill 567.  Because we reach that conclusion, we do not address Yamamoto's arguments under Assembly Bills 124 and 518.

### B.  Background

At the sentencing hearing, the prosecution emphasized that Yamamoto's crimes had devastated his victims; that he had abused his daughter's trust in him; that he was a sheriff's deputy at the time he molested his daughter; that he persisted in his crimes against M.Y. despite her pleas to stop and attempts to get away; and that his crimes involved planning.  Accordingly, the prosecution requested the maximum sentence of 94 years and eight months for Yamamoto, arguing that consecutive terms

were appropriate because Yamamoto had time to pause, reflect, and stop the abuse between each of his crimes.[10]

Yamamoto's trial counsel argued that Yamamoto's crimes against M.Y. and J.R. could be grouped into six courses of conduct: one on July 12th (counts 1, 2, and 3); one on August 9th (counts 4, 5, 6, and 7); one on August 22 (count 8); one on August 23 (counts 9, 10, 11, and 13); and two separate crimes against J.R. (counts 28 and 29). Thus, defense counsel stated: "The defense concedes that with the facts that have been presented and the findings from the jury, that an upper term sentence is warranted." However, counsel argued that a 34-year sentence would be "enough to protect society, to punish Mr. Yamamoto for the conduct that the jury found him guilty of, to encourage Mr. Yamamoto to lead a law-abiding life, [and] to deter others from criminal conduct."[11]

The trial court explained that it had considered the probation officer's report, the prosecution's sentencing brief, victim statements, E.Y.'s

---

[10] The maximum sentence would have included consecutive eight-year upper terms for all 11 forcible sex convictions, the upper term of four years for count 9, and consecutive eight-month terms (or one third the midterm) for each of counts 14, 15, 28, and 29.

[11] The defense requested a total of 34 years as follows: (1) upper terms of eight years for all counts relating to the July 12, 2018 course of conduct, with counts 2 and 3 to run concurrent to count 1; (2) an upper term eight-year sentence for count 4 as relating to the August 9th course of conduct, with counts 5, 6, and 7 to run concurrent; (3) an eight-year upper term sentence for count 8 as relating to the August 22d conduct; (4) an eight year upper term sentence for count 10 as relating to the August 23d course of conduct, with counts 9, 11, and 13 to run concurrent; (5) an eight-month consecutive term for count 14; and (6) eight-month consecutive sentences for each of counts 28 and 29. Counsel agreed with the probation officer's recommendation that count 15 be stayed pursuant to section 654.

statement, and Yamamoto's statement. The court then considered circumstances in mitigation and aggravation as follows:

> "The only factor in mitigation that I think applies to Mr. Yamamoto is that he has no prior criminal record.
>
> "I'm noting the following factors in aggravation. One of the victims was his biological daughter. The other was also a family member.
>
> "It is clear from their testimony and from their victim statements today that . . . these acts have affected them both deeply and will have a lasting effect on them for a significant period of time.
>
> "There was some planning to set up some of the sexual incidents, including the setup of a camera in the bedroom. The manner in which he approached his daughter was coercive and cruel in this court's opinion.
>
> "Clearly, the jury opined that the defendant's testimony was not truthful and misleading . . . I agree.
>
> "As [M.Y.]'s father, he took advantage of a position of trust and confidence to commit the offense; so consecutive sentencing is mandatory for multiple forcible sex crimes."

The trial court further explained: "I am finding that the conduct charged on the same day, for the dates of July 12th, August 9th, August 22d, and August 23d of 2019 against [M.Y.] . . . were not simply a change of position without reflection. These were separate and distinct acts between which the defendant had a reasonable opportunity to reflect . . . and, nevertheless, continued on to the next act."

The court clarified that it found that consecutive terms were appropriate under section 667.6, subdivisions (c) and (d). Moreover, it stated that it had considered California Rules of Court, rules 4.421 and 4.423 and sentenced Yamamoto as follows:

37

"For count 1, I'm selecting the upper term of eight years; count 2, I'm selecting the middle term of six years at full-strength, consecutive; for count 3, I'm selecting the middle term of sex years at full-strength, consecutive; for count 4, I'm selecting the upper term of eight years at full-strength, consecutive; for count 5, I'm selecting the midterm of six years at full-strength, consecutive; for count 6, I'm selecting the midterm of six years at full-strength, consecutive; for count 7, I'm selecting the midterm of six years at full-strength, consecutive; for count 8, I'm selecting the upper term of eight years at full-strength, consecutive; for count 10, I'm selecting the upper term of eight years at full-strength, consecutive; for count 11, I'm selecting the midterm of six years at full-strength, consecutive; for count 13, I'm selecting the midterm of six years at full-strength and consecutive.

"So pursuant to Penal Code section 667.6(c) and (d), for those counts, that is a total of 74 years.

"Pursuant to Penal Code section 1170, the remaining counts are sentenced as follows: For count 9, I am selecting the upper term of four years; for count 14, the upper term of—well, it's one-third the midterm, but I would select the upper term if given the opportunity—so one-third the midterm of two years is consecutive.

"I do agree with probation and with [defense counsel] that count 15, Penal Code section 285, incest, is barred, pursuant to Penal Code section 654; so I'll select the upper term of three years, but that is stayed, per Penal Code section 654.

"Count 28, I am selecting the middle term as consecutive so that's an additional eight months; the same for count 29, that is consecutive.

"So pursuant to Penal Code section 1170, that is an additional six years for a total prison term of 80 years."

## C. Analysis

Senate Bill 567, which became effective on January 1, 2022, modified section 1170, subdivision (b), to require imposition of the middle term of imprisonment unless circumstances in aggravation justify imposition of a greater sentence and are found true beyond a reasonable doubt or stipulated to by the defendant. (Stats. 2021, ch. 731, § 1.3.) Senate Bill 567 thus altered the statutory scheme for selecting between triad terms under section 1170 subdivision (b). (Stats 2021, ch. 731, § 1.3.) Moreover, the parties agree that Senate Bill 567 applies retroactively and is applicable here because judgment against Yamamoto is not yet final. (See *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039; *In re Estrada* (1965) 63 Cal.2d 740, 745.)

However, the parties disagree regarding whether remand for resentencing is required under Senate Bill 567. The People argue it is not, contending that the trial court properly imposed the upper term because Yamamoto stipulated to an upper term. To this end, they emphasize that Yamamoto's trial counsel stated: "The defense concedes that with the facts that have been presented and the findings from the jury, that an upper term sentence is warranted." Further, defense counsel requested the upper term sentences for all but three counts, asking that the sentences run concurrently. As such, the People maintain that Yamamoto "stipulated to all the facts underlying all of the aggravating factors and agreed to the upper term, and the trial court properly relied on the stated factors to impose the upper term sentences."

Yamamoto acknowledges his trial counsel's stipulation here but argues that it "was made without the benefit of [Senate Bill] 567's . . . ameliorative changes to Penal Code section 1170[, subdivision] (b)." This point is well taken. At the time Yamamoto was sentenced, section 1170, former

subdivision (b), left it to the sentencing court's "sound discretion" to select the appropriate term within a sentencing triad that "best serves the interests of justice." (§ 1170, former subd. (b).) As the parties agree, Senate Bill 567 curtailed the trial court's discretion during sentencing. As such, we place little value on Yamamoto's trial counsel's stipulations or concessions during the sentencing hearing wherein, at the time, the trial court had vastly more discretion to select the sentence that it does under the current law.

Despite the change in the law, the People essentially argue the trial court did not err. We disagree. Although defense counsel conceded that this was an "upper term case," he did so under the prior version of section 1170, subdivision (b). Such a concession is not the same as a jury finding an aggravated factor beyond a reasonable doubt or a defendant admitting that factor. Rather, the record clearly shows that Yamamoto's trial counsel made a tactical decision in the context of the former subdivision (b). That strategic choice is not of the moment in a post Senate Bill 567 world.

Typically, if we conclude that a trial court erred, we engage in harmless error analysis to evaluate whether the appellant was prejudiced. For sentencing errors like the one here, we adopted a two-step method for determining the harmlessness when a defendant was sentenced to an upper term before Senate Bill 567. (See *People v. Lopez* (2022) 78 Cal.App.5th 459, 465-468 (*Lopez*).)

"[T]he initial relevant question for purposes of determining whether prejudice resulted from failure to apply the new version of the sentencing law is whether the reviewing court can conclude beyond reasonable doubt that a jury would have found true beyond a reasonable doubt *all* of the aggravating factors on which the trial court relied in exercising its discretion to select the upper term. If the answer to this question is 'yes,' then the defendant has not

40

suffered prejudice from the court's reliance on factors not found true by a jury in selecting the upper term." (*Lopez*, *supra*, 78 Cal.App.5th at p. 467, fn. 11.) If, however, the answer to the question is "no," then we apply the harmlessness standard in *People v. Watson* (1956) 46 Cal.2d 818, 836, to the trial court's reliance on impermissible factors. (*Lopez*, at p. 467 & fn. 11.) That is, we ask whether it is reasonably probable that the trial court would have imposed a shorter sentence if the trial court had relied only on factors that we are convinced beyond a reasonable doubt would have been found by a jury beyond a reasonable doubt. (*Ibid.*; *Watson*, at p. 836.) If the answer to that question is "yes," then we remand the matter to the trial court for resentencing. (*Lopez*, at p. 467, fn. 11.)

In the instant matter, Yamamoto argues in his opening brief that the court erred under Senate Bill 567, he was prejudiced, and the matter must be remanded for resentencing. Yamamoto did not discuss the harmless error standard from *Lopez* in his opening brief, and the People did not discuss it in their respondent's brief. But Yamamoto had a good reason for his omission. We had not yet issued our *Lopez* opinion at the time Yamamoto filed his opening brief. However, that opinion was filed almost five months before the People submitted the respondent's brief. Not only did the People not discuss *Lopez*, they neglected to address harmless error regarding Yamamoto's claim under Senate Bill 567 whatsoever. Accordingly, we construe the People's silence on this issue as a concession that if we conclude the trial court erred, remand is required.

" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have

41

been based on misinformation regarding a material aspect of a defendant's record.' [Citation.]" (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391; see *People v. Marquez* (1983) 143 Cal.App.3d 797, 803 ["an erroneous understanding by the trial court of its discretionary power is not a true exercise of discretion"].) Here, although the trial court properly exercised its discretion under the law as it existed at the time of the sentencing hearing, its discretion was considerably limited under Senate Bill 567. As Senate Bill 567 applies to Yamamoto because his case is not yet final, on the record before us, it is clear the trial court could not have acted with informed discretion and remand for resentencing is required. (Cf. *Gutierrez*, at p. 1391.)

On remand, the prosecution may elect to proceed under the requirements of the newly-amended version of section 1170, subdivision (b), which would permit the prosecution to prove the existence of aggravating factors beyond a reasonable doubt to a jury, unless Yamamoto waives the right to a jury and agrees to have the factors decided by the court beyond a reasonable doubt; alternatively, the prosecution may accept resentencing on the record as it stands.

Yamamoto also contends that he is entitled to resentencing under Assembly Bills 124 and 518. Because we have concluded that we must vacate Yamamoto's sentence and remand for resentencing, on remand the trial court may revisit all of its prior sentencing decisions in light of all new legislation. (See *People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425, ["[T]he full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"]; accord, *People v. Buycks* (2018) 5 Cal.5th 857, 893.)

IV

ABSTRACT OF JUDGMENT

The trial court imposed, and the abstract of judgment reflects, a $680 court operations assessment (Pen. Code, § 1465.8) and a $510 conviction assessment (Gov. Code, § 70373). The parties agree that the amount imposed for each assessment was improper.

Penal Code section 1465.8 authorizes an assessment of $40 per conviction, and Government Code section 70373 authorizes an assessment of $30 per conviction. The jury convicted Yamamoto on 16 counts. Therefore, the trial court should have imposed an assessment of $640 under Penal Code section 1465.8 and $480 per Government Code section 70373. Therefore, because we are remanding this matter to the superior court for resentencing, the court can ensure that the amended abstract correctly states the amount imposed for the subject assessments.

DISPOSITION

We vacate Yamamoto's sentence. We remand this matter to the superior court for resentencing consistent with this opinion. Further, after resentencing Yamamoto, the superior court shall amend the abstract of judgment to reflect Yamamoto's new sentence as well as the correct amount of the assessments accessed. In all other respects, the judgment is affirmed.

The superior court is to forward the amended abstract of judgment to the Department of Corrections and Rehabilitation.

HUFFMAN, Acting P. J.

WE CONCUR:

IRION, J.

DATO, J.